**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KYLEAF TEAGLE | : | |
| | : | |
| Appellant | : | No. 817 EDA 2023 |

Appeal from the PCRA Order Entered April 8, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0002670-2017

BEFORE:   NICHOLS, J., SULLIVAN, J., and COLINS, J.*

MEMORANDUM BY SULLIVAN, J.:                **FILED OCTOBER 17, 2024**

Kyleaf Teagle ("Teagle") appeals from the order dismissing his first petition for relief filed pursuant to the Post Conviction Relief Act ("PCRA").[1] We affirm.

This Court previously set forth the following factual history:

> On the morning of June 16, 2016, Salim Abdul-Latif [("Abdul-Latif")], the decedent, arrived at the house of his friend, Walter Hill [("Hill")], on the 5100 block of Arbor Street. [Teagle's] brother, Imiear Teagle [("Imiear")], was already there. [Teagle] and his brother had been friends with Abdul-Latif their whole lives and, although they were not related by blood, considered Abdul-Latif as their cousin.  At that time, Imiear, Abdul-Latif, and Hill often hung out at Hill's house because Hill was on house arrest for a robbery conviction.  [At] [a]round 1:15 p.m., Abdul-Latif began to exchange several phone calls with [Teagle].  After receiving one such call, Abdul-Latif went into the bathroom.  When Abdul-Latif came out of the bathroom, he said he would be right back and

---

* Retired Senior Judge assigned to the Superior Court.

[1] **See** 42 Pa.C.S.A. §§ 9541-9546.

told Imiear to "come on." Abdul-Latif exited through Hill's front door and got into the driver's seat of his girlfriend's Pontiac Grand Prix, which was parked right in front of Hill's house.

At approximately 1:37 p.m., [Teagle] arrived at the scene riding a bicycle. Imiear then went to stand next to [Teagle] near the driver's side of Abdul-Latif's car. Then Imiear went back inside Hill's house to ask Hill for a sweatshirt while [Teagle] remained near the driver's side of the vehicle. Hill brought Imiear a sweatshirt at the front door and Imiear walked out of Hill's house. At approximately 1:50 p.m., as Imiear was walking from the house toward the car, [Teagle] shot Abdul-Latif six times. [Teagle] then fled on his bicycle. Medics pronounced Abdul-Latif dead at the scene. Abdul-Latif had four gunshot wounds to his head and two to the back of the neck. Police collected six .380 caliber fired cartridge cases and one live cartridge at the scene.

Philadelphia police detectives then conducted an investigation of the murder. When Officer David Quaintance arrived on the scene, he noticed a surveillance camera on a nearby homeowner's property and recovered the video, which recorded Abdul-Latif's murder. Later, Officer Timothy Stephan [("Officer Stephan")], who worked patrol for nearly 8 years in the area where [Teagle] lived, identified [Teagle] as the shooter on the surveillance video.

On June 22, 2016, a warrant was issued for [Teagle's] arrest. Officers could not locate [Teagle], and therefore, Philadelphia's Homicide Fugitive Squad was tasked with finding him. After several months of unsuccessful searching, on November 17, 2016, the Homicide Fugitive Squad, now aided by the U.S. Marshalls, received an anonymous tip that [Teagle] was in Florida. On November 22, 2016, U.S. Marshalls arrested [Teagle] in Ocala, Florida.

*Commonwealth v. Teagle*, 2634 EDA 2018, 2019 WL 6334533, at *1–*2

(Pa. Super. 2019) (unpublished memorandum) (some brackets in original)

(*quoting* Trial Court Opinion, 12/17/18, at 2-4).

Prior to trial, Teagle's trial counsel filed a motion *in limine* to preclude

Abdul-Latif's mother, Rasheeda Wright ("Wright"), from testifying at trial and

identifying Teagle as the shooter in the video capturing the murder, because, *inter alia*, Wright had been present at the preliminary hearing in apparent violation of the court's sequestration order. ***See*** Motion *in Limine*, 5/3/18. Following an evidentiary hearing, the trial court denied the motion. ***See*** N.T., 5/7/18, at 197-99.

The case proceeded to a jury trial, during which, the Commonwealth called, *inter alia*, Detective Thorsten Lucke ("Detective Lucke") to testify as an expert in video extraction. ***See*** N.T., 5/9/18, at 82. Detective Lucke created a compilation video of the shooter to aid the jury in determining whether it was in fact Teagle depicted in the video of the victim's shooting. ***See id***. at 117-19. The Commonwealth additionally called Officer Stephan to testify, and he identified Teagle as the shooter from the video based on his experience working in Teagle's neighborhood. ***See*** N.T., 5/9/18, at 61-62. The trial court allowed Officer Stephan to identify Teagle over counsel's objection that he could not properly cross-examine Officer Stephan without mentioning Teagle's prior criminal activity. ***See*** N.T., 5/7/18, at 225-26. Hill—whose residence was the location where these events precipitated—testified for the Commonwealth and explained on cross-examination that he expected that none of the information he provided about the murder would be used against him for prosecution for unrelated crimes. ***See*** N.T., 5/8/18, at 154. Hill also admitted to a prior conviction for *crimen falsi*, *i.e.*, receiving stolen property. ***See id***. at 156-57.

Another officer, Kamil Jasinski ("Officer Jasinski"), also testified at trial and made passing reference to Teagle's "PPN" number, which was not defined for the jury, but which the parties knew referred to Teagle's prison number attached to a photo. **See** N.T., 5/8/18, at 240. There was no objection or request for a mistrial following this fleeting reference.

During deliberations, the jury asked to view the video of the shooting again, this time on a laptop computer, which the trial court permitted. **See** N.T., 5/11/18, at 12.[2] Following the jury trial:

> [The jury convicted Teagle of, *inter alia*,] murder of the first degree[, and related offenses.] The [c]ourt immediately imposed the mandatory sentence of life in prison for the murder charge . . ., with no further penalty for the other charges. [Following sentencing, trial counsel moved to withdraw, and the trial court granted the motion and appointed direct appeal counsel.]
>
> [Teagle] filed post-sentence motions, which the [c]ourt denied [i]n August [] 2018. [I]n November [] 2019, the Superior Court affirmed [Teagle's] judgment of sentence[,] and [i]n June [] 2020, the Supreme Court of Pennsylvania denied *allocatur*.. . .
>
> [I]n August [] 2021, [a new attorney, first PCRA counsel,] filed a counseled petition on behalf of [Teagle]. . . The . . . [c]ourt [ultimately] dismissed [Teagle's] PCRA petition.
>
> * * * *
>
> . . . On March 9, 2023, [following procedural developments not germane to this appeal,] the [PCRA] [c]ourt . . . reinstated [Teagle's] right to appeal from th[e c]ourt's . . . order dismissing his PCRA petition. The [c]ourt also granted [first PCRA counsel's] motion to withdraw and entered an order to appoint [present

_____

[2] Teagle's counsel, when asked if the video looks different on the laptop, answered, "It does look **slightly** more clear, so it's different." N.T., 5/11/18, at 12 (emphasis added).

PCRA] counsel[, who] filed a notice of appeal to the Superior Court of the dismissal order.

PCRA Court Opinion, 6/13/23, at 1-3. Both Teagle and the PCRA court complied with Pa.R.A.P. 1925.

Teagle raises the following issues for our review:

1. Was the PCRA court's dismissal of [Teagle's] PCRA Petition not supported by the [r]ecord and free from legal error because direct appeal counsel was ineffective for not arguing that the trial court erred by not suppressing the prejudicial testimony of [] Wright when she violated the sequestration [o]rder entered at the [p]reliminary [h]earing?

2. Was the PCRA court's dismissal of [Teagle's] PCRA [p]etition not supported by the [r]ecord and free from legal error because direct appeal counsel was ineffective for failing to argue in a manner that was not waived that the trial court abused its discretion by allowing the jury, during deliberations, to view video on a better resolution laptop, video that was not presented at trial in the same format and [Teagle] suffered prejudice as a result?

3. Was the PCRA court's dismissal of [Teagle's] PCRA [p]etition not supported by the [r]ecord and free from legal error because trial counsel was ineffective and [Teagle] suffered prejudice due to the fact that Detective [] Lucke was qualified as an expert in video extraction but nonetheless gave testimony that can only have been viewed by the jury as expert testimony in behavioral analysis?

4. Was the PCRA court's dismissal of [Teagle's] PCRA [p]etition not supported by the [r]ecord and free from legal error because trial and direct appeal counsel were ineffective and [Teagle] suffered prejudice because counsel failed to preserve and argue that Officer [] Ste[ph]an's testimony excessively implicated [Teagle] in prior criminal activity and this, in turn, violated [Teagle's] Confrontation Clause rights because, *inter alia*, the jury heard about Officer Ste[ph]an's five-year exposure to [Teagle] and Detective Brian Peters asking Officer Ste[ph]an to come and view the videotape of the underlying incident?

5. Was the PCRA court's dismissal of [Teagle's] PCRA [p]etition not supported by the [r]ecord and free from legal error because trial counsel was ineffective for stipulating that [Abdul-Latif's] drug toxicology was not part of the case when potential evidence of [him being] a drug user and dealer would have potentially implicated alternate suspects that even Officer Stephan accepted could be mistaken for [Teagle]?

6. Was the PCRA court's dismissal of [Teagle's] PCRA [p]etition not supported by the [r]ecord and free from legal error because trial counsel was ineffective for not cross-examining [] Hill as to favorable police and Commonwealth treatment in relation to Hill's testimony and his own active criminal supervision?

7. Was the PCRA court's dismissal of [Teagle's] PCRA [p]etition not supported by the [r]ecord and free from legal error because trial counsel was ineffective for failing to investigate and cross-examine Officer Stephan regarding his own misconduct and motive for enhancing cooperation with the Commonwealth during ongoing investigation and potential discipline?

8. Was the PCRA court's dismissal of [Teagle's] PCRA [p]etition not supported by the [r]ecord and free from legal error because trial counsel was ineffective for failing to object, request a curative instruction, and a mistrial when Officer [] Jasinski testified as to [Teagle] having a prior criminal record?

Teagle's Brief at 4-6.

Our standard of review of an order dismissing a PCRA petition is well-settled:

> Our review of a PCRA court's decision is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error. We view the record in the light most favorable to the prevailing party in the PCRA court. We are bound by any credibility determinations made by the PCRA court where they are supported by the record. However, we review the PCRA court's legal conclusions *de novo*.

- 6 -

*Commonwealth v. Staton*, 184 A.3d 949, 954 (Pa. 2018) (internal citation and quotations omitted). Further, "there is no absolute right to an evidentiary hearing on a PCRA petition, and if the PCRA court can determine from the record that no genuine issues of material fact exist, then a hearing is not necessary." *Commonwealth v. Springer*, 961 A.2d 1262, 1264 (Pa. Super. 2008) (internal citation, quotations, and brackets omitted). The PCRA petitioner "has the burden to persuade this Court that the PCRA court erred and that such error requires relief." *Commonwealth v. Wholaver*, 177 A.3d 136, 144–45 (Pa. 2018) (internal citations omitted).

All of Teagle's issues concern allegations of ineffective assistance of counsel. In order to be eligible for PCRA relief, the petitioner must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated circumstances found in section 9543(a)(2), which includes the ineffective assistance of counsel. *See* 42 Pa.C.S.A § 9543(a)(2)(ii); *see also Commonwealth v. Benner*, 147 A.3d 915, 919–20 (Pa. Super. 2016). To prevail on an ineffectiveness claim, the petitioner has the burden to prove: "(1) the underlying substantive claim has arguable merit; (2) counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance." *Benner*, 147 A.3d at 920 (internal citations and quotations omitted). The failure to

satisfy any of these prongs is fatal to a petitioner's claim. ***See id***. Additionally, counsel is presumed effective. ***See id***.

Regarding "arguable merit," this Court has provided that, "[t]he first inquiry in an ineffectiveness claim is always whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit; for counsel cannot be considered ineffective for failing to assert a meritless claim." ***Commonwealth v. Lott***, 581 A.2d 612, 614 (Pa. Super. 1990) (internal citation and quotations omitted). For the "reasonable basis" prong, the petitioner must show that counsel "had no reasonable basis designed to effectuate his client's interests." ***Id***. Lastly, to establish prejudice, the petitioner "must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's action or inaction." ***Commonwealth v. Brown***, 161 A.3d 960, 965 (Pa. Super. 2017) (internal citation omitted).

The three-prong ineffectiveness test delineated above applies to appellate counsel as well. ***See***, ***e.g.***, ***Commonwealth v. Blakeney***, 108 A.3d 739, 749-50 (Pa. 2014). As for appellate counsel specifically,

> [w]ith regard to "reasonable basis" in the appellate context, it is well settled that appellate counsel is entitled, as a matter of strategy, to forego even meritorious issues in favor of issues he believes pose a greater likelihood of success.

***Id***. at 750 (internal citations, quotations, and brackets omitted). Regarding prejudice, the PCRA petitioner must show that "there is a reasonable

probability that the outcome of the direct appeal proceeding would have been different but for counsel's deficient performance." **See id**. **Accord Commonwealth v. Koehler**, 36 A.3d 121, 142 (Pa. 2012) (noting that, to succeed on a claim of ineffectiveness vis-à-vis appellate counsel, a petitioner must show that counsel's asserted ineffectiveness affected the outcome of the appeal).

In his first issue, Teagle argues direct appeal counsel was ineffective for failing to raise the issue of Wright's testimony at trial following her apparent violation of the court's sequestration order at the preliminary hearing. The appropriate remedy for a violation of sequestration order is as follows:

> Where violation of a sequestration order occurs, the remedy selected:
>
>> . . . is within the sound discretion of the trial court. In exercising its discretion, the trial court should consider the seriousness of the violation, its impact on the testimony of the witness, and its probable impact on the outcome of the trial. We will disturb the trial court's exercise of its discretion only if there is no reasonable ground for the action taken.
>>
>> Additionally, the trial court should consider whether . . . the party calling the witness procured h[er] disobedience. Further, a mistrial may be granted only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict.

**Commonwealth v. Rose**, 172 A.3d 1121, 1127 (Pa. Super. 2017) (internal citations, quotations, brackets, and indentation omitted; some ellipses in original). To warrant PCRA relief predicated on ineffective assistance of counsel arising from a violation of a sequestration order, a petitioner must

show, *inter alia*, prejudice. ***See***, ***e.g.***, ***Commonwealth v. Pursell***, 724 A.2d 293, 310 (Pa. 1999).

Teagle argues direct appeal counsel was ineffective for "failing to specifically and separately argue that Wright's testimony was suppressible based on her violation of the sequestration order at the . . . preliminary hearing." Teagle's Brief at 14 (unnecessary capitalization omitted). According to Teagle, it was uncontested that Wright violated the sequestration order, and her testimony was "critical to the Commonwealth." ***Id***. Teagle reasons that if counsel raised the issue before the trial court, then it was a "reasonable basis for appeal as well." ***Id***. at 15-16. Teagle maintains Wright identified him "based upon the references and identifications [made by] other people." ***Id***. at 16.

The PCRA court considered this issue and concluded it merited no relief:

> . . . Wright is the mother of the decedent, [] Abdul-Latif. [I]n May [] 2018, trial counsel, . . . filed a motion *in limine* to preclude Wright from identifying [Teagle] at trial as the shooter in the video that captured the murder. [Teagle] asserted two grounds for this relief: (1) Wright's identification was improper lay opinion testimony; and (2) Wright was present at [Teagle's] preliminary hearing in violation of a sequestration order. . . . On May 7, 2018, following an evidentiary hearing, the [c]ourt denied [Teagle's] motion to preclude the testimony of Wright. On direct appeal, defense counsel argued that the [c]ourt erred in permitting Wright to make the identification, but only on the ground that it was improper lay opinion testimony. [Teagle] now claims that direct appeal counsel was ineffective for failing also to argue that the trial court should have suppressed the testimony of Wright on the ground that she violated the sequestration order.
>
> Under Pennsylvania Rule of Evidence 615, the [c]ourt may order sequestration in order to prevent a witness from learning

- 10 -

from the testimony of another witness. The decision whether or not to permit a witness who has broken a sequestration order to testify is within the sound discretion of the trial judge. . . .

Here, it was not contested that Wright was in the courtroom throughout the preliminary hearing in violation of the presiding judge's sequestration order. During the hearing, the Commonwealth played the video of the shooting, and Wright recognized [Teagle] as the shooter. However, prior to seeing the video at the preliminary hearing, Wright knew nothing about the case.

The record establishes that there was no basis to bar Wright from testifying for violating the sequestration order at the preliminary hearing. Prior to seeing the video at the preliminary hearing and recognizing [Teagle], Wright had no reason to believe that she would be a witness in the case and was attending solely because she was the mother of [Abdul-Latif]. Hence, the violation was unquestionably unintentional. Moreover, there is no reason to believe that the Commonwealth procured any violation of the sequestration order, nor that Wright's viewing of the video at the preliminary hearing for the first time altered the testimony that she would have given at trial had she first seen the video before, or after, the hearing. Therefore, there was no reason for the [c]ourt to take the extraordinary measure of barring Wright from testifying based on her presence at the preliminary hearing.

Accordingly, appellate counsel had no reason to include a meritless claim on appeal regarding the alleged sequestration order violation. No relief is due.

PCRA Court Opinion, 6/13/23, at 6-8. (citations to the record omitted).

Following our review, we conclude the PCRA court's ruling is supported by the evidence and free of legal error. At a pre-trial hearing on Teagle's motion *in limine*, Wright testified that she was friends with Teagle's mother, that "[w]e always did everything with our children together," and that historically, Teagle had been over to Wright's house daily. N.T., 5/7/18, at 170. In the months leading up to the murder, Wright testified she had seen

Teagle about two to three times a week, and he had stayed over at her house about three weeks prior to the shooting because Teagle's parents had told him to leave their house and he "didn't have anywhere to stay." *Id*. at 171. She described his mannerisms, including the fact that he would nervously scratch or rub his head and avoid eye contact; and she was familiar with his build and appearance. *Id*. at 172-74. Additionally, the way Teagle and his brother moved and interacted with each other in the video was consistent with her prior observations of them. *See id*. at 178. It is indeed uncontested that Wright was at the preliminary hearing and saw about five minutes of the video during which she recognized Teagle, without a doubt in her mind. *See id*. at 176. Prior to the preliminary hearing, she had not seen any portion of the video or talked to eyewitnesses about the shooting. *See id*. at 177. Wright remained in the courtroom because no one told her to leave. *See id*. at 176. Wright did not tell the prosecutor after the hearing that she could identify Teagle because the prosecutor did not ask. *See id*. at 183. However, the week before trial, Wright informed a detective that she recognized Teagle in the video. *See id*. at 184. The trial court found Wright to be "a very credible witness," with an "extraordinary relationship, very unusual[,] with [Teagle], intimate knowledge of him, viewing him as part of the family, seeing him for a while every day," and that the court believed Wright when she said "she wouldn't believe it was [Teagle] unless she saw it with her own eyes . . .." *Id*. at 197. Given Wright's independent ability to identify Teagle in the video, along with Teagle's attorney's ability to cross-examine her," the trial court

denied the motion *in limine*. ***See id***. at 199. The standard of review for a ruling following a sequestration violation is abuse of discretion. ***See Rose***, 172 A.3d at 1127. Teagle has failed to show how his argument that the trial court abused its discretion would have succeeded had counsel raised it in the direct appeal. Accordingly, Teagle's ineffectiveness issue fails. ***See Pursell***, 724 A.2d at 310; ***Blakeney***, 108 A.3d 749-50; ***Koehler***, 36 A.3d at 142.

In his second issue, Teagle argues the PCRA court committed an error of law by concluding that direct appeal counsel was not ineffective for failing to argue that the jury should not have been permitted to watch the video of the shooting during deliberations.[3] We note that this Court has previously concluded on direct appeal in this case that "the video, and more precisely the manner in which it was displayed during deliberations, is not specifically prohibited by Pa.R.Crim.P. 646(C)." ***Teagle***, 2019 WL 6334533 at *5. Thus, the decision as to whether to allow the jury to view the video on the laptop during deliberations fell "squarely within the discretion of the trial court." ***Id***. Following the prior appellate review of the record, we concluded, "the trial

---

[3] A trial court's decision regarding which exhibits the jury may view during deliberations is subject to an abuse of discretion standard. ***See Commonwealth v. Hawkins***, 701 A.2d 492, 512 (Pa. 1997). Pennsylvania Rule of Criminal Procedure 646(A) provides that the jury "may take with it such exhibits as the trial judge deems proper, except as provided in paragraph (C)." Pa.R.Crim.P. 646(A). Paragraph (C) provides that the jury "shall not be permitted to have" during deliberations the following: a transcript of trial testimony; a copy of a written or "otherwise recorded confession by the defendant"; a copy of the information or indictment; and written jury instructions, with some exceptions. ***See*** Pa.R.Crim.P. 646(C). Anything not prohibited by Rule 646(C) is thus within the trial court's discretion.

court did not abuse its discretion in permitting the jury to view the video on a laptop computer, as opposed to a large television monitor, during deliberations." *Id*. We concluded in the alternative that even if the trial court had erred, the manner of presentation had only a "*de minim[i]s* effect on the presentation of the video," and thus did not prejudice him to the extent that he was entitled to a new trial. *Id*.[4] Given this Court's prior resolution of the issue, the PCRA court concluded that Teagle could not show prejudice resulting from appellate counsel's stewardship. *See* PCRA Court Opinion, 6/13/23, at 8-9.

Following our review, we conclude the PCRA court did not commit an error of law. As noted above, trial counsel conceded that the video was the same except that it looked "slightly more clear[.]" N.T., 5/11/18, at 12. Additionally, this Court has already concluded that the trial court did not abuse its discretion in allowing the jury to view the video, but even if it had erred,

_____

[4] We did not conclude on direct appeal that Teagle had waived this evidentiary issue. Therefore, since we decided this issue, it is covered by *res judicata*, or the "law of the case" doctrine. *See*, *e.g.*, *Commonwealth v. Lenig*, 589 A.2d 700, 703 (Pa. Super. 1991) (stating that "where an appellate court has considered and decided a question on appeal, that Court will not, in a subsequent appeal of another phase of the same case, reverse its previous ruling . . .."). We note, however, that we did find Teagle's due process and confrontation rights arguments (premised on the same facts) undeveloped and thereby waived. *See Teagle*, 2019 WL 6334533 at *5. Teagle misstates the record when he asserts that this Court found both issues waived. *See* Teagle's Direct Appeal Brief at 18. We additionally note that Teagle does not pursue constitutional claims in his current appellate brief, and therefore has abandoned them. *See Commonwealth v. Bullock*, 948 A.2d 818, 823 (Pa. Super. 2008) (providing that issues not developed in an appellant's brief are abandoned).

the impact of the video, when viewed on the laptop, was *de minimis*. This holding is binding on this Court. **See Teagle**, 2019 WL 6334533 at *5; **Lenig**, 589 A.2d at 703. Direct appeal counsel raised this issue, this Court rejected it on the merits, and, accordingly, Teagle cannot show prejudice.[5] **See Koehler**, 36 A.3d at 142. Thus, Teagle's second issue merits no relief.

In his third issue, Teagle argues the PCRA court erred in concluding trial counsel was not ineffective for declining to object to Detective Lucke's testimony about the compilation video depicting Teagle. Pennsylvania Rule of Evidence 701, which governs admission of lay testimony, provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

_____

[5] Teagle cites **Commonwealth v. Antidormi**, 84 A.3d 736, 755-56 (Pa. Super. 2014) in support of his argument wherein this Court held that the replay of prior testimony in open court was not error; however, Teagle's reliance on that case is unavailing because **Antidormi** did not hold that the replay of testimony was **required** to be done in open court. **See also Commonwealth v. Johnson**, 241 A.3d 398, 404-05 (Pa. Super. 2020) (holding the trial court did not err in permitting the jury to review video footage and "freeze frame" it during deliberations, and noting it occurred in open court). In **Yankowsky v. Katz**, 662 A.2d 665, 667-68 (Pa. Super. 1995), this Court held that the trial court did not abuse its discretion in disallowing a jury to view a video during deliberations, but allowing the jury to review still images from the video; we did not hold that the trial court was precluded from allowing the jury to review the video during deliberations. **Contra** Teagle's Brief at 19. In any event, assuming error, this Court has already concluded the harm was *de minimis*. **See Teagle**, 2019 WL 6334533 at *5.

> (c) not based on scientific, technical, or other specialized knowledge

Pa.R.E. 701. Whereas, Rule 702, which pertains to expert testimony, states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.[6]  Our Supreme Court has explained that "[e]xpert testimony is permitted only as an aid to the jury when the subject matter is distinctly related to a science, skill, or occupation beyond the knowledge or experience of the average layman."  *Jones*, 240 A.3d at 890 (brackets in original). Expertise, whether acquired as a result of formal education or by experience, is expertise.  *See Jones*, 240 A.3d at 890.  However, the same witness may testify as both a lay and expert witness.  *See id*.  A fact-witness who offers opinion testimony and "provide[s] insights gained through specialized occupational training and experience not within the average layperson's knowledge base" functions as an expert witness.  *See id*. at 891.  On the

---

[6] The standard of review governing trial courts' evidentiary rulings is abuse of discretion.  *See*, *e.g.*, *Commonwealth v. Jones*, 240 A.3d 881, 889 (Pa. 2020).

other hand, an officer gives lay opinion if the testimony is limited to what he observed or to other facts derived exclusively from a particular investigation. *See*, *e.g.*, *Commonwealth v. Huggins*, 68 A.3d 962, 969-70 (Pa. Super. 2013).

Teagle argues that, because of the "poor quality of the video" depicting the murder, the Commonwealth's case hinged on an identification of him based on "his exhibiting certain behaviors and mannerisms which were consistent with behaviors and mannerisms exhibited by [Teagle]." Teagle's Brief at 24. Teagle argues that Detective Lucke, who was qualified as an expert in video extraction, gave expert opinion when he drew the jury's attention to portions of his compilation video that established similar mannerisms by Teagle and the suspect. *See id*. at 26. Teagle argues trial counsel was ineffective for failing to object to Detective Lucke's "behavior analysis" testimony, since Detective Lucke was not qualified as an expert in this area. *See id*. at 27. He argues counsel had no reasonable basis for this omission, and it prejudiced him because the jury believed Detective Lucke was "a qualified 'expert' [who] direct[ed] their attention to certain portions of multiple videotapes and to certain mannerisms." *Id*. at 28.

The PCRA court considered this issue and concluded it merited no relief:

> At trial, Detective Lucke was qualified as an expert in video extraction and analysis, as well as cellular electronic device extraction and analysis. During his testimony, he explained that as he reviewed the video from the crime scene, he observed the perpetrator exhibit certain mannerisms. He also testified that he had extensive video of [Teagle] taken while he was in a police

- 17 -

interrogation room. He further testified that he prepared a compilation video showing the mannerisms of the perpetrator from the crime scene video side-by-side with video of [Teagle] from the interrogation video. Detective Lucke testified that he did this for the purpose of a "comparative analysis."

However, Detective Lucke, at no time, rendered an opinion that [Teagle] was the person depicted in the crime scene video. Rather, he stated that he assembled "pieces or segments that [he] . . . believe[d] would be useful and to be used as a comparison[,]" leaving the actual comparison to the jury.

Accordingly, the record establishes that [D]etective Lucke never expressed any expert opinions in the area of "behavioral analysis." Instead, as a qualified expert in video extraction and analysis, he assembled a compilation video to allow the jurors to determine if any of [Teagle's] demonstrated mannerisms from an interrogation room video would be helpful in identifying the perpetrator from the crime scene video. For that reason, trial counsel had no valid grounds for challenging Detective Lucke's testimony as being improper expert testimony. No relief is due.

PCRA Court Opinion, 6/13/23, at 9-10 (citations to the record omitted).

Following our review, we conclude the PCRA court's ruling is supported by the record and free of legal error. We observe that at no point in the portions of testimony Teagle contests did Detective Lucke draw on any expertise, whether based on formal training or experience. Rather, Detective Lucke drew the jury's attention to "mannerisms" readily observable in the video which appeared to be similar in different portions of the video. *See*, *e.g.*, 5/9/18, at 113-20. To the extent Detective Lucke may have implied Teagle was the same person as the suspect in the video based on the consistency of the "mannerisms," *see id*. at 119-20, this was based on just his observations of the video rather than any specialized knowledge he brought to bear on those observations. Accordingly, Detective Lucke did not

testify as an expert in behavior analysis, and, accordingly, any objection to his testimony on this basis would have been unsuccessful. *See Huggins*, 68 A.3d at 969-70. Therefore, Teagle's argument merits no relief. *See Lott*, 581 A.2d at 614 (counsel cannot be ineffective for failing to pursue a meritless claim).

In his fourth argument, Teagle argues trial counsel was ineffective for failing to move to preclude the testimony of Officer Stephan based on the Confrontation Clause.[7] Regarding the Confrontation Clause, our Supreme Court has explained:

> [T]he Confrontation Clause of the Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. This right of confrontation was extended to the individual states *via* the Fourteenth Amendment. Significantly, the Supreme Court of the United States has explained that "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 [(1990)]. The Confrontation Clause's language and "historical underpinnings" evince that the Clause safeguards a defendant's right to confront witnesses who "bear testimony" against him or her; as such, the right to confrontation applies only to testimonial statements.

---

[7] While Teagle, in his statement of questions presented, faults both trial and appellate counsel, he focuses his argument on trial counsel's omission. *See* Teagle's Brief at 29-35. Accordingly, Teagle has waived his ineffectiveness claim against direct appeal counsel. *See Commonwealth v. Felder*, 247 A.3d 14, 20 (Pa. Super. 2021) (holding that issues identified on appeal but not developed in the appellant's brief are abandoned, and, consequently, waived).

- 19 -

*Commonwealth v. Weeden*, 304 A.3d 333, 344–45 (Pa. 2023). (some internal citations and quotations, and footnote omitted).[8] In context of cross-examination, this Court has elaborated:

> [T]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. Of particular relevance here, [the Supreme Court of the United States has] recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, and prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. . . [T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Commonwealth v. Akrie*, 159 A.3d 982, 988 (Pa. Super. 2017) (ellipses in original). *See also Commonwealth v. Bozyk*, 987 A.2d 753, 757 (Pa. Super. 2009) (holding that a police officer may be cross-examined about misconduct "as long as the wrongdoing is in some way related to the defendant's underlying criminal charges and establishes a motive to

---

[8] The Sixth Amendment analysis also applies to the Article I, Section 9 of the Pennsylvania Constitution. *See*, *e.g.*, *In re N.C.*, 105 A.3d 1199, 1210 n.15 (Pa. 2014); *see also Weeden*, 304 A.3d at 363 n.83 (Wecht, J. concurring). Our standard of review for an asserted Confrontation Clause violation is *de novo*, as it is a question of law. *See Commonwealth v. Yohe*, 79 A.3d 520, 543-44 (Pa. 2013).

fabricate," but that "if the prior police behavior is unrelated to the present matter and irrelevant, the trial court is permitted to restrict questioning on the prior incident").

Teagle argues that trial counsel failed to "make any direct argument and/or present any case law" in support of his motion to preclude the testimony of Officer Stephan. *See* Teagle's Brief at 31. Teagle maintains that "[c]ounsel should have argued that[,] under the specific facts of this case, there would be no way that Officer Stephan's testimony could be presented without simultaneously causing irreparable prejudice to the defense," because the defense would be unable to "vigorously cross[-]examine" him about his "motive and long-standing bias against [Teagle]." Teagle's Brief at 31, 33. Teagle's assertion of bias on the part of Officer Stephan appears to stem from two prior arrests of the former by the latter. *See id*. at 30, 33.

The PCRA court considered this issue and concluded it merited no relief:

> As to trial counsel, [Teagle's] claim is frivolous. Trial counsel filed a motion *in limine* to exclude Officer Stephan from testifying, and during the argument on that motion, explicitly argued Officer Stephan[] should not be permitted to make an identification since "my client's confrontation rights are going to be limited. Because in order to robustly cross-examine this witness, I would need to confront him about [two prior criminal incidents involving [Teagle]], and I don't want to go there at trial." N.T.[,] 5/7/[]18[,] at 225-[]26.
>
> . . . In ruling on the *in limine* motion, the [c]ourt barred Officer Stephan from mentioning any arrests or criminal activity. At trial, Officer Stephan testified that he became familiar with the members of the community in his patrol area as part of his function of community outreach and trying to build a rapport with the community. In that context, he stated that he spent time with

[Teagle] and got to know him. On cross-examination, trial counsel emphasized that Officer Stephan had only seen [Teagle] about 10 times over a six-year period, and that on the day that he identified [Teagle] in the crime scene video, he had not seen him for about a year. There were no limits on [Teagle's] cross-examination, and no objections were made during the cross-examination.

. . . [C]ounsel effectively explored Officer Stephan's limited exposure to [Teagle] and[,] therefore, his limited basis for being able to make an identification of [Teagle] from a videotape. Accordingly, the record refutes [Teagle's] Confrontation Clause claim. No relief is due.

PCRA Court Opinion, 6/13/23, at 10-12 (some citations to the record omitted).

Based on our review, we conclude the record supports the PCRA court's ruling, and we discern no error of law. We note that at the hearing on pre-trial motions, Officer Stephan testified. Officer Stephan stated that he arrested Teagle as a juvenile for firearms violations in 2012 and that in 2014 or 2015, Officer Stephan attempted to stop a black Cadillac with heavy window tint, and the vehicle fled and crashed, and Teagle exited the vehicle, and was apprehended following a foot chase. *See* N.T., 5/7/19, at 204-06. Teagle's trial counsel cross-examined Officer Stephan and elicited nothing that specifically showed bias on the part of Officer Stephan. *See generally id*. at 211-18. Thus, while the record shows that Officer Stephan twice arrested Teagle, this does not in itself establish that Officer Stephan had a bias against Teagle, and nothing about the circumstances of the arrests, as reflected in the record, evinces bias by Officer Stephan. Moreover, as the trial court notes, while the Commonwealth was prohibited from eliciting testimony from Officer Stephan at trial that he had previously arrested Teagle, the court put no

restraints on Teagle's cross-examination of Officer Stephan. In other words, Teagle baldly asserts bias on the part of Officer Stephan but has pointed to no evidence of record of actual bias. We further note counsel made the exact same argument before the trial court (albeit without the case law Teagle now cites). *See id*. at 225-26 (defense counsel arguing, "[T]he problem here is my ability confront this witness, my client's confrontation rights are going to be limited. Because in order to robustly cross-examine this witness, I would need to confront him about those two incidents, and I don't want to go there at trial"). Because Teagle has failed to show prejudice, *i.e.*, that the outcome of the proceedings would have differed had trial counsel objected in the manner Teagle specifies, he is due no relief. *See Brown*, 161 A.3d at 965 (stating that a PCRA petitioner seeking relief must show prejudice).

In his fifth issue, Teagle argues trial counsel was ineffective for stipulating that the defense would not introduce Abdul-Latif's toxicology report showing he had ingested drugs. Generally, all relevant evidence is admissible unless otherwise provided by law, and evidence that is not relevant is inadmissible. *See* Pa.R.E. 402. Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Pa.R.E. 401. In some cases, victim intoxication may be relevant, such as where it helps the jury "to understand a material element of [a] crime, [such as] causation . . . ." *Commonwealth v. Uhrinek*, 544 A.2d 947, 951-52 (Pa. 1988) (holding that

evidence of a victim's intoxication is admissible where it is relevant to whether the decedent, who might have been intoxicated, jaywalked into the path of the defendant's vehicle).

Here, Teagle argues evidence showing the victim had used drugs would have contributed to his misidentification defense because, "[a]ccording to Officer Stephan, Antonio Hatchett, and the Harper [b]rothers all had the potential to be mistaken for [Teagle]. N[.]T[.], 5/7/[]18, at 204." Teagle's Brief at 36-37. Teagle's argument seems to be that the victim may have engaged in a drug transaction with others who might have been mistaken for Teagle. Teagle additionally argues that evidence of the victim's drug use could be impeachment material for Wright because she "had a motivation to downplay any drug use by her son[,] and even more so, any drug sales he made from **her** home. She could be held criminally responsible for them." **Id**. at 37 (emphasis in original).

> The PCRA court considered this issue and concluded it merited no relief:
>
> > [Teagle] claims that "trial counsel was ineffective for stipulating that [Abdul-Latif's] drug toxicology was not part of the case when potential evidence of [Abdul-Latif] as a drug user and dealer would have potentially implicated alternate suspects that even Officer Stephan accepted could be mistaken for [Teagle]." [Teagle's Concise] Statement of Errors at ¶5. . . .
> >
> > The toxicology report had little, if any, probative value in support of the defense of misidentification: While the report could establish that [Abdul-Latif] was using drugs, [] Hill testified at trial that [Abdul-Latif] was involved with selling drugs. To the extent that [Teagle] wished to offer a theory that multiple people had a motive to kill [Abdul-Latif] due to his drug involvement, the

- 24 -

toxicology report would have been cumulative, and offered *de minim[i]s* support for that theory. Accordingly, trial counsel did not deprive [Teagle] of effective assistance by failing to offer the report. No relief is due.

PCRA Court Opinion, 6/13/23, at 12.[9]

Following our review, we conclude Teagle has failed to establish he is due relief. The PCRA court correctly concluded that "[t]he toxicology report had little, if any, probative value in support of the defense of misidentification." **See** PCRA Court Opinion, 6/13/23, at 12. We explain: We observe that Teagle indeed has misstated the record. Officer Stephan did not testify that Antonio Hatchett and the Harper brothers could be mistaken for Teagle. Rather, at the place in the record Teagle cites, Officer Stephan testified that Teagle "also hangs with a gentleman, Antonio Hatchett, along with several of the Harper brothers . . .." N.T., 5/7/18, at 204.[10] As such, evidence that Abdul-Latif had used drugs does not have any relation to the

_____

[9] Additionally, the Commonwealth maintains that Teagle has not "identified **how** the toxicology report would have been valuable in impeaching Wright's credibility," as he does not specify which portion of the testimony would be undercut by evidence of the victim's drug use, nor does Teagle "explain how evidence of the victim's drug use would cast doubt on Wright's ability to identify [Teagle] from the surveillance video." Commonwealth's Brief at 20 (emphasis in original). The Commonwealth also asserts that Teagle's reference to the record, *i.e.*, that Antonio Hatchett and the Harper brothers "had the potential to be mistaken" for Teagle is erroneous. **See id**. at 21 n.9.

[10] While it is Teagle's responsibility to cite to portions of the record that support his argument, **see** Pa.R.A.P. 2119(c), our independent review has uncovered no testimony at trial that these individuals could be mistaken for each other.

possibility of misidentification of Teagle for Hatchett or the Harper brothers. Additionally, Teagle fails to explain how evidence of Abdul-Latif's drug *use*—which is what the toxicology report would show—would be relevant to impeaching Wright. That is, Teagle does not articulate how Abdul-Latif's drug use could create criminal liability for Wright such that she would fabricate her testimony in which she identified Teagle as the shooter in the video. ***Contra*** Teagle's Brief at 37. Accordingly, Teagle has failed to show the toxicology report was relevant, and that its absence prejudiced him such that the outcome of the trial would have differed had it been admitted. ***See*** Pa.R.E. 401 (irrelevant evidence is inadmissible); ***Lott***, 581 A.2d at 614 (counsel cannot be ineffective for failing to pursue a meritless issue); ***Brown***, 161 A.3d at 965 (a claim of ineffectiveness requires a showing of prejudice).

In his sixth issue, Teagle argues the trial court erred in concluding counsel was not ineffective for failing to further cross-examine Hill about a "deal" he made with the Commonwealth in exchange for his testimony against Teagle. Where a jury is made aware of a witness's immunity agreement, "any questions regarding this issue on cross-examination would have been merely cumulative of what [the witness] had already said," and, therefore, cannot give rise to prejudice. ***Commonwealth v. Hall***, 876 A.2d 619, 638 (Pa. Super. 2005).

Here, Teagle argues that counsel failed to introduce "***any*** evidence of the 'deal' Hill made to identify [Teagle]." Teagle's Brief at 40. Nor, Teagle

continues, did trial counsel explore the "'bias' this deal created," which "would have likely discredited" Hill. *Id*. at 40-41.

The PCRA court considered this issue and concluded it merited no relief:

> At trial, Hill testified that he was on house arrest in 2016 after pleading guilty to robbery and that he was still on probation for that arrest at the time of [Teagle's] trial. On cross-examination, trial counsel questioned Hill regarding his cooperation with the police, and Hill confirmed that the police had told him that "any information [he] provided about the homicide regarding unrelated crimes, such as the sale of illegal drugs, cannot and will not be used against [him] in any criminal proceedings, including any parole or probation violations." After further interrogation by trial counsel on cross-examination, Hill also confirmed his 2015 robbery conviction, as well as an additional conviction for receiving stolen property. During closing arguments, trial counsel thoroughly discussed Hill's prior convictions and the purpose of this impeachment evidence.
>
> Accordingly, the record refutes [Teagle's] claim that trial counsel failed to effectively cross-examine Hill. The jury was fully aware of Hill's *crimen falsi* convictions, his open probation case, and the promise the police made to him that he would not to be prosecuted, or have probation or parole revoked, for any criminal conduct that he revealed to the police during his cooperation. Because trial counsel thoroughly explored the possible impeachment evidence regarding Hill, [Teagle's] ineffectiveness claim fails. No relief is due.

PCRA Court Opinion, 6/13/23, at 12-13 (citations to the record omitted).

Based on our review, the PCRA court's ruling is supported by both the record and the law. Here, trial counsel elicited from Hill on cross-examination that the police told him that any information he provided about the homicide "regarding unrelated crimes, such as the sale of illegal drugs, cannot and will not be used against you in any criminal proceedings, including any parole or probation violations." N.T., 5/8/18, at 154. Hill also conceded on cross-

examination that at the time of the shooting, he was on house arrest following a conviction for robbery. *See id*. at 156-57. Counsel, during closing, argued:

> We know that Trap[, AKA Hill,] was talking to the detectives for two hours before he gives a written statement, the detectives making promises to him like we can't use anything like this against you, you don't worry. Trap had stuff to worry about. Trap wanted to give them something.

N.T., 5/10/18, at 21. The foregoing shows that trial counsel made the jury aware of the non-prosecution agreement Hill had with the Commonwealth. Apart from speculation, Teagle fails to show what other information counsel might have elicited. Accordingly, Teagle has failed to show prejudice. *See Hall*, 876 A.2d at 638. Thus, this issue merits no relief.

In his seventh issue, Teagle argues, based on a newspaper article, that trial counsel was ineffective for failing to investigate and cross-examine Officer Stephan about his involvement in a shooting in January 2018, months prior to the trial in this case. Generally, newspaper articles "do not constitute evidence." *Commonwealth v. Brown*, 134 A.3d 1097, 1108-09 (Pa. Super. 2016). Rather, "allegations in the media, whether true or false, are no more evidence than allegations in any other out-of-court situation." *Id*. (internal citation and brackets omitted). *See also id*. at 1109 (affirming denial of PCRA relief where the petitioner "solely relies on [a] newspaper article reporting on . . . possible misconduct and does not articulate what evidence he would present at [an] evidentiary hearing on remand"); *Commonwealth v. Foreman*, 55 A.3d 532, 537-38 (Pa. Super. 2012) (holding that allegations

- 28 -

of misconduct in an unrelated incident where misconduct was "pure conjecture . . . would not compel a different jury verdict").

Teagle argues that trial counsel should have investigated and cross-examined Officer Stephan about the shooting, the subsequent investigation into the shooting, and whether he was suspended as a result of the shooting. *See* Teagle's Brief at 43. Teagle argues that Officer Stephan could have been prosecuted as a result of the shooting, and therefore he had "motive to curry favor with the Commonwealth," by testifying against Teagle. *See id*.

The PCRA court considered this issue and concluded it merited no relief:

> First, [Teagle] proffered no evidence in support of this claim. It is well-established that assertions in a newspaper article are not evidence. While this matter was raised during the hearing on [Teagle's] motion *in limine* to prevent Officer Stephan from testifying, the only information proffered was a statement by the prosecutor that Officer Stephan was "awaiting his clearance" following a shooting incident, and so, would not be testifying in uniform.
>
> Moreover, evidence that Officer Stephan was involved in a completely unrelated and disputed police shooting would have virtually no probative value and not be admissible in evidence. Accordingly, trial counsel could not have been ineffective for failing to impeach Officer Stephan with such evidence at trial.

PCRA Court Opinion, 6/13/23, at 13-14 (citations omitted).

Following our review, we conclude the PCRA court's ruling is supported by the record and contains no error of law. We note that Teagle relies solely upon quotations from a newspaper article about Officer Stephan's involvement in a shooting. *See* Teagle's Brief at 41-42. These allegations are not evidence. *See*, *e.g.*, *Brown*, 134 A.3d at 1108-09. In any event, the

information Teagle cites from the newspaper article does not show that Officer Stephan committed misconduct. Rather, Teagle engages in pure conjecture by asserting that cross-examination about this unrelated incident would have resulted in a different verdict. *See Foreman*, 55 A.3d at 537-38. Accordingly, Teagle's assertion of ineffectiveness arising from trial counsel's failure to investigate, and cross-examine Officer Stephan about, the shooting merits no relief.

In his eighth and final issue, Teagle argues the PCRA court's ruling was supported by neither the record nor the law insofar as it denied Teagle relief based on trial counsel's alleged ineffectiveness for failing to object or request other relief when Officer Jasinski made a passing reference to his "PPN" number. Our Supreme Court has explained: "[A] mere passing reference to photographs does not amount to prejudicial error. [Rather,] references to prior police contact do not amount to reversible error. Instead, it is only those references that expressly or by reasonable implication also indicate some involvement in prior criminal activity that rise to the level of prejudicial error." *Commonwealth v. Young*, 849 A.2d 1152, 1156 (Pa. 2004) (internal citations and quotations omitted). This Court has elaborated:

> [A]fter the reference to a photograph [selected from police files] the controlling question is whether or not a juror could reasonably infer from the facts presented that the accused had engaged in prior criminal activity. . . . [T]he unexplained possession by the police of a defendant's photo [is not necessarily] proof that the defendant had a previous conviction. Instead, one's picture may be in the possession of the police even though the person was neither charged, tried[,] nor convicted of any

crime. . . . At the most it proves only that the police had a photo of the defendant on file.

***Commonwealth v. Parker***, 104 A.3d 17, 27–28 (Pa. Super. 2014) (some brackets in original; internal citations, quotations, and some brackets omitted).

Teagle argues that when Officer Jasinski testified about his PPN number, he "clearly conveyed to the jury the fact that [Teagle] had previously been arrested and incarcerated." Teagle's Brief at 45. Teagle argues that a mistrial was the most appropriate remedy, and that even a curative instruction would have been insufficient.[11] ***See id***. at 45-46.

The PCRA court considered this issue and concluded it merited no relief:

> At trial, Officer Jasinski testified regarding an incident he responded to that involved [Teagle's] mother. Officer Jasinski testified that, as part of his police report regarding the incident, he wrote down [Teagle's] name, date of birth, and "PPN number," which he was able to access from his police computer. [Teagle] asserts that this testimony "clearly conveyed to the jury the fact that [Teagle] had previously been arrested and incarcerated." [Teagle thus] argues that trial counsel was ineffective for failing to move for a mistrial, or, alternatively, move to strike the testimony and request a curative jury charge. [Teagle's] claim is without merit.

_____

[11] This Court has noted that "a mistrial is an extreme remedy only warranted when the prejudice to the movant cannot be ameliorated to ensure a fair trial." ***Commonwealth v. Wilson***, 273 A.3d 13, 20–21 (Pa. Super. 2022), *appeal denied*, 285 A.3d 324 (Pa. 2022) (internal citation and quotations omitted). A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. ***See id***. Therefore, we review a trial court's decision to deny a motion for a mistrial pursuant to an abuse of discretion standard. ***See id***.

It is true that Officer Jasinski was referring to [Teagle's] prison number when he used the term "PPN." However, the term was never defined for the jury or mentioned again. Therefore, it is far from clear that this reference informed the jurors that [Teagle] had previously been arrested.

Moreover, it is well [] established that such a passing reference to a police identification number, even when explicit, is not grounds for relief on appeal. . . .

Accordingly, Officer Jasinski's passing reference here to [Teagle's] "PPN number" did not require a mistrial. No relief is due.

PCRA Court Opinion, 6/13/23, at 14-15 (footnote omitted).[12]

Following our review, we discern no error of law by the PCRA court. Officer Jansinski testified that he responded to a radio call, spoke to Teagle's mother, and documented the information he received: ". . . I wrote down the two names of two of her sons. The first son was Kyleaf Teagle. I put 20-year-old black male, his date of birth, 8/31/95. His PPN number, I was able to pull that up from the police computer." N.T., 5/8/18, at 240. "PPN number" went undefined here; therefore, as in *Parker*, the testimony here proved at most that police had some number in their computer related to Teagle; it neither established he had been charged or convicted as a result of any

---

[12] Additionally, the Commonwealth observes that in *Wilson*, this Court rejected an appellant's assertion that a witness's reference at trial to a "PP num"—which the parties knew stood for "police photo number"—was prejudicial and required a mistrial. 273 A.3d at 21-22; *see also* Commonwealth's Brief at 27. There, this Court concluded the "remark was fleeting and in no way suggested that [Wilson] was involved in prior criminal activity." *Wilson*, 273 A.3d at 21.

criminal activity. ***See Parker***, 104 A.3d 17, 27–28. The fleeting reference to the unexplained "PPN number" thus did not rise to the level of denying Teagle a fair trial, and, accordingly, he has failed to show that his motion for a mistrial would have been granted. ***See Wilson***, 273 A.3d at 21. For the foregoing reasons, Teagle has failed to show prejudice, *i.e.*, that trial counsel's omission affected the outcome of the trial, and, therefore, he is due no relief.[13]

Thus, none of Teagle's issues merit relief, and, accordingly, we affirm the order dismissing Teagle's PCRA petition.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/17/2024

---

[13] Additionally, we observe that counsel may make a "strategic decision not to request a cautionary instruction so as not to draw attention to the matter." ***Parker***, 104 A.3d at 27-28. ***Accord*** PCRA Court Opinion, 6/13/23, at 15 n.1 (stating, "[A cautionary] instruction would have necessarily informed the jurors of the meaning of the term 'PPN.' Therefore, it was manifestly reasonable for counsel not to request such an instruction").